513 So.2d 493 (1987)
STATE of Louisiana, Appellee,
v.
Thomas P. HEATH, Appellant.
No. 18957-KA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1987.
Rehearing Denied October 22, 1987.
*495 Davenport, Files & Kelly by Thos. W. Davenport, Jr., Monroe, for appellant.
Attorney General's Office by Glen R. Petersen, Asst. Atty. Gen., Baton Rouge, for appellee.
Before SEXTON, NORRIS and LINDSAY, JJ.
SEXTON, Judge.
The defendant, Thomas P. Heath, has appealed his conviction on four counts (Counts 4, 6, 8 and 11) of a multi-count bill of information for Medicaid fraud under LSA-R.S. 14:70.1. We find no merit to the numerous assignments of error with the exception of Assignment of Error Number 8 as it pertains to Count 6. We affirm the conviction and sentence on Counts 4, 8 and 11 and reverse the conviction and sentence on Count 6.
In 1982, the defendant, a licensed pharmacist, owned and operated Heath's Drugs, Inc. in Rayville, Louisiana. He also owned forty percent of Medi-Shop, Inc. in Mangham, Louisiana. Larry Weston, also a licensed pharmacist, owned another thirty percent of Medi-Shop and a woman named Betty Jo Gray owned the remaining thirty percent of the business. During the fall of 1982, Medi-Shop was operated by Doug White, another licensed pharmacist. Medi-Shop was closed in the spring of 1983.
Both Heath's and Medi-Shop were participants in the Medicaid program of the State of Louisiana in 1982. Each pharmacy had a separate provider contract and number.
In August of 1982, David Harrison, a licensed pharmacist and former employee of the defendant, contacted the Medicaid Fraud Unit of the Louisiana Attorney General's office and reported irregularities in the filling of prescriptions at Heath's and Medi-Shopirregularities primarily concerned with the substitution of generic drugs for brand name drugs for Medicaid recipients. As a result of Harrison's report, the Medicaid Fraud Unit conducted a "call out."
In a recipient call out, the Medicaid Fraud Unit sends letters to Medicaid recipients in the general area of the pharmacy involved and asks them to bring all their prescription drugs to the welfare office on a specific date. The call out revealed that some of the prescription vials issued by the aforesaid pharmacies contained generic drugs while the labels indicated that they should contain brand name drugs. A search warrant was issued, and a seizure was made at Heath's in December of 1982. The investigation which followed uncovered evidence that the defendant had submitted claims for reimbursement which listed higher priced brand name medications rather than the less expensive generic drugs actually dispensed to Medicaid recipients.
*496 The defendant was charged with thirteen counts of Medicaid fraud by bill of information on July 26, 1985. The trial began, after a change in venue, on August 11, 1986 and continued through August 15, 1986, on which date the jury found the defendant guilty of four of the thirteen counts charged.

DISCOVERY COMPLAINTSASSIGNMENTS OF ERROR 1 AND 2
The defendant contends that the trial court erred (a) in permitting the state on the eve of trial to file the "Amended Answer to Defendant's Motion for Discovery" concerning Jane Pettito and the "Amended Response to Brady Motions" concerning Lydia Oswalt; (b) in permitting the state to file the "Amended Response to Brady Motion" concerning Larry Weston on the second day of trial; and (c) in denying the defendant's motion for the production of copies of the interview summaries of Larry Weston to which the "Amended Response to Brady Motion" referred.
In his motion for discovery, the defendant sought to determine if there existed any oral confessions made by him which the state intended to offer as evidence, and if so, when, where and to whom such oral confessions or statements were made. Pursuant to its continuing obligation to disclose under LSA-C.Cr.P. Art. 729.3, the state, on the morning of the first day of trial, filed an amended discovery answer revealing an inculpatory statement that the defendant had allegedly made to Ms. Pettito sometime shortly after the search warrant was issued in 1982. Ms. Pettito did not inform the prosecutor of this conversation until August 7, 1986, just a few days before trial. In brief the defendant contends that the answer was untimely and prejudicial but makes no further specific argument in this respect.
We find that the state has complied with its continuing duty to disclose discoverable material and that the trial court did not err by its failure to impose sanctions on the state due to the late filings. The record reflects that the state did not know of the Pettito statement until shortly before the trial began and disclosed it to the defendant as soon as it was feasible. Importantly, the defendant has asserted no specific prejudice in this regard.
Even if the state had not complied with its continuing duty to disclose, there is still no reversible error since the defendant did not show that this failure resulted in prejudice to him. State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Booth, 448 So.2d 1363 (La.App. 2d Cir.1984); State v. Busby, 464 So.2d 262 (La.1985), cert. denied 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165, (1985). Additionally, the trial court gave him an opportunity for a continuance, but the defendant declined.
Also in Assignment of Error Number 1, the defendant argues that the trial court erred in allowing the state to file the "Amended Response to Brady Motions" on the first day of trial. In his first motion for exculpatory material under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the defendant sought discovery and production of the names of any of his employees or former employees who had been interviewed by the state and who denied the allegations of misconduct charged in the bill of information. In its "Amended Response to Brady Motion" filed on the first day of trial, the state revealed that it had interviewed Ms. Oswalt on January 14, 1983. She claimed at that time to have no knowledge of anyone in the defendant's stores who was substituting generic drugs in Medicaid recipients' prescriptions and billing the state for brand name drugs. On March 5, 1986, Ms. Oswalt was interviewed again and this time admitted that she was aware of a system of substitution misbilling at Heath's. The state advised the defendant of Ms. Oswalt's change in testimony by an amended Brady response of the first day of trial. The defendant argues that the January 14, 1983 statement was exculpatory and should have been included in the state's first Brady responses.
In Assignment of Error Number 2, the defendant also argues that the trial court erred in allowing the state to file an "Amended Response to Brady Motion" concerning Larry Weston on the second day of trial. On the evening of the first day of *497 trial, Weston informed the state that he was instructed by the defendant to substitute generic drugs for brand name drugs. This statement was contrary to earlier statements given by Weston in which he had stated that he had no knowledge of any substitution of generics for brand name drugs for Medicaid patients or of any false billing of the state.
Under Brady v. Maryland, supra, the state, upon the defendant's request, must disclose evidence that is favorable to the defendant when it is material to guilt or punishment. Neutral evidence does not fall into this category. State v. Vampran, 491 So.2d 1356 (La.App. 1st Cir.1986), writ denied 496 So.2d 347 (La.1986). Both Ms. Oswalt and Mr. Weston had initially stated that they had no knowledge of any substitution of generic drugs for brand name drugs or of any misbilling. Even if these statements were exculpatory material, the failure of the state to disclose them does not constitute reversible error unless actual prejudice results to the defendant. State v. Booth, supra. The defendant has demonstrated no prejudice to himself as a result of the late filings.
The defendant further contends in Assignment of Error Number 2 that he is entitled to copies of an interview summary of Larry Weston which had been prepared by the state during its investigation.[1] Because Mr. Weston's statement was read into the record, the defendant has suffered no prejudice. The defendant knew the text of the summary and was able to confront the witness with his earlier statements.
Assignments of Error 1 and 2 are without merit.

TRIAL ASSERTIONSASSIGNMENTS OF ERROR 4, 5 AND 6
Assignment of Error Number 4 complains that the trial court erred in excluding defendant's Exhibit D-10. In Assignments of Error 5 and 6, the defendant complains that the trial court erred in allowing the rebuttal testimony of David Harrison and in limiting the surrebuttal testimony of the defendant while excluding Doug White as a surrebuttal witness.

Exhibit D-10
Exhibit D-10 is a certified copy of a civil petition filed by David Harrison against the defendant seeking back wages and expenses he contends are due him from the defendant. Mr. Harrison testified that the defendant had billed the state for brand name drugs when in fact he had dispensed generics to Medicaid recipients. The defendant urged that the civil lawsuit was necessary to document the bias that this witness had against him. The record shows that Harrison was cross-examined extensively concerning his civil suit against the defendant. Any bias which this witness may have had was adequately demonstrated to the jury. The trial judge correctly excluded the petition which was, in a large part, cumulative of the trial testimony and, in other parts, beyond the scope of the criminal trial.
The trial court judge has wide discretion in determining the relevancy of evidence and his determination will not be overturned absent a clear abuse of discretion. State v. Huizar, 414 So.2d 741 (La.1982). Such an abuse of discretion is not evident in the instant case.

*498 Rebuttal Testimony

The rebuttal testimony of David Harrison concerned a particular bottle of pills (Exhibit S-20) found at Heath's. The bottle was labeled Persantine but contained a generic substitute. On direct examination, the defendant testified that a couple of days before the search of the pharmacy he had placed the generic drug in that bottle while he showed a customer the generic and explained that it was the same as the brand name, except that it was cheaper. The defendant testified that he became busy and did not have a chance to switch the drugs back before the search. David Harrison, however, had advised the investigator of the presence of the substitution to that particular pill bottle months before the search. The state recalled him to the stand to contradict the defendant's explanation.
Under LSA-R.S. 15:282, the prosecutor has the right to rebut the evidence adduced by the defendant. "Rebuttal evidence is that which is offered to explain, repel, counteract or disprove facts given in evidence by the adverse party." State v. Huizar, supra, at 750; State v. Trosclair, 443 So.2d 1098, 1106 (La.1983), cert. dismissed 468 U.S. 1205, 104 S.Ct. 3593, 82 L.Ed.2d 889 (1984). "The determination of whether evidence is rebuttal evidence and hence, admissible, is an issue which is addressed to the sound discretion of the trial court judge." State v. Huizar, supra, at 750.
Through Harrison's testimony, the state properly rebutted the earlier testimony by the defendant about why and when the generics were placed in the brand name bottle. The trial judge did not abuse his discretion in allowing this testimony.

Surrebuttal Testimony
The surrebuttal testimony of the defendant also concerned Exhibit S-20. Doug White was excluded as a surrebuttal witness by the court because he had been in the courtroom during other testimony despite a sequestration order. Because the record does not indicate that the defendant made a contemporaneous objection to the court's ruling, his objection is precluded on appeal. LSA-C.Cr.P. Art. 841.
The defendant also assigns as error the trial court's limiting the surrebuttal testimony of the defendant. The defendant's complaint here is likewise precluded by a lack of contemporaneous objection.
We do note, however, that although the prosecution has a right to rebut evidence adduced by the defendant, the defendant does not have the right to rebut the prosecution's rebuttal. LSA-R.S. 15:282. The court in its discretion, however, may permit the introduction of additional evidence prior to argument. LSA-C.Cr.P. Art. 765(5); State v. Howard, 449 So.2d 69 (La.App. 4th Cir.1984). The court in this case exercised that discretion and allowed surrebuttal testimony of the defendant.
In the case of rebuttal testimony, the control of evidence presented by the state on rebuttal is within the sound discretion of the trial judge whose ruling will not be disturbed except in extreme cases, as where the evidence has been kept back deliberately and for the purpose of deceiving and obtaining undue advantage over the defendant. State v. Williams, 445 So.2d 1171 (La.1984). Likewise, a trial court's determination with respect to surrebuttal testimony is also within its sound discretion. We find no abuse of the exercise of that discretion in limiting the testimony of the defendant on surrebuttal.
Assignments of Error 4, 5 and 6 are without merit.

JURY INSTRUCTIONSASSIGNMENT OF ERROR 7
The defendant contends that the trial court erred in refusing to give one of the three requested jury instructions concerning the testimony of an informer and an accomplice. The court reasoned that if the jury accepted the defense position, accomplice testimony would not be relevant because the defendant denied committing the offense and denied any participation with anyone else. If the jury accepted the testimony of Harrison and Weston, the instruction would not be relevant because Harrison and Weston testified that they were employees of Heath, they were acting *499 under his direction, and they stood to gain nothing from making these substitutions. The court refused to give the instruction on testimony by an informer because it considered Harrison to be merely a person who reported a crime and not an informer.
Under LSA-C.Cr.P. Art. 807, a requested special charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given. In this case, the special charge was contained in the court's general charge. The trial court instructed the jury that they should consider any reason that a particular witness had for testifying in favor of or against the state, and they had the right as jurors to accept or reject the testimony of any witnesses. The court also instructed the jury that the testimony of a witness may be discredited by showing that the witness will benefit in some way by the defendant's conviction, or that the witness has any other reason or motive for not telling the truth. Since the substance of the special instructions are included in the general, the special did not need to be given. The trial court did not commit error in refusing to give the defendant's special jury charge.
Moreover, even if it were error not to give the instruction, the failure to give a requested charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Pettaway, 450 So.2d 1345 (La.App. 2d Cir.1984), writ denied 456 So.2d 171 (La.1984). The defendant has neither alleged nor proven that any of these infirmities exist.
Assignment of Error Number 7 is without merit.

EVIDENCE SUFFICIENCYASSIGNMENT OF ERROR 8
By this assignment of error, defendant contends that the evidence produced at trial relevant to the counts upon which he was convicted, Counts 4, 6, 8 and 11, was legally insufficient to sustain his conviction for Medicaid fraud, a violation of LSA-R.S. 14:70.1.[2]
Under the standard of review enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the state, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
William Root, an investigator with the Medicaid Fraud Unit of the Attorney General's office, testified that the investigation in this case began upon the receipt of a phone call from David Harrison, a pharmacist at Heath's, who advised of his suspicions that Mr. Heath was billing the state for higher priced brand name drugs and yet dispensing generics.
As a result, the Attorney General's office dispatched letters to Medicaid recipients doing business with Mr. Heath's pharmacies and received a number of responses. The parties who responded were contacted, and where discrepancies seemed to exist, the investigators obtained the pertinent pill bottles along with two tablets from each bottle.
*500 The recipients contacted were chosen from a review of "Script 19 forms," which are the claim forms filed by a pharmacist to receive reimbursement for Medicaid prescriptions. The drugs and bottles taken from the recipients were compared to those forms, and charges were filed in those instances where generic drugs were apparently supplied and the state had been billed for brand name drugs.
The state proved its overpayment for the generic drugs dispensed by virtue of its "Remittance Advice" form, which indicates the specific pharmacy seeking payment, the drug and recipient involved, the amount billed and the amount paid by the state in response. The state further introduced its cancelled checks which had been furnished to the two pharmacies for the drug transactions which provided the basis for the counts charged. Through the foregoing, the state proved that it had been billed for brand name drugs on the four counts for which the defendant was convicted, that brand name drugs were not in the vials which the recipients had obtained and that the defendant's pharmacies were paid for brand name drugs.[3]
This aspect of the case was completed by the testimony of John McArthur, an expert in pharmacology and identification of drugs. Mr. McArthur testified that on each of the the counts upon which defendant was convicted the drug contained in the bottle obtained from the Medicaid recipient was in fact a generic and not the drug for which the state had been billed.
Thus, we reach the serious issue presented by this assignmentwhether or not the evidence is sufficient, when viewed in the light most favorable to the prosecution, for a reasonable trier of fact to determine that the defendant knowingly and intentionally submitted the false information to obtain greater compensation than that to which he was entitled.
The evidence presented relevant to the defendant's guilty knowledge includes various notices and agreements contained in forms which the defendant signed in order to participate as a Medicaid provider.[4]
With respect to the Script 19 forms, it should be noted that Mr. Heath did not sign any of the forms submitted for the prescriptions at issue.
Also, he explained the existence of generic drugs in brand name bottles on the shelves of his pharmacies as a procedure employed to save space. When questioned as to the lack of a pharmacist's name on most of the pill bottles dispensed, he responded that he was not aware of a requirement that the name of the pharmacist who filled the prescription be placed on the bottle.[5] He further testified that he could not say whether or not he had filled any of the prescriptions at issue.
By this and his other testimony, the defendant attempted to contradict the state's evidence with respect to the issue of the defendant's guilty knowledge.
David Harrison, who initiated the probe leading to the defendant's arrest, testified that he was instructed by Mr. Heath to "check out" Medicaid customers with respect *501 to such characteristics as age and intelligence to determine if a customer was a likely candidate for substitution of generic drugs. Harrison also testified that Heath advised him that the prescriptions of those customers, which remained on file with the pharmacies, were to be specially marked with a dot enclosed in a circle. He further testified that in certain instances, national drug code numbers on the prescriptions were changed to reflect a smaller package size than that originally ordered in order to take advantage of the higher per unit price pertinent to smaller packages. Mr. Harrison testified that although he never placed generics in brand name bottles at Heath's pharmacy in Rayville, he did so at the Medi-Shop store in Mangham pursuant to the instructions of Mr. Heath. It should be noted that Mr. Harrison conceded in his testimony, however, that none of the four prescriptions corresponding to the four counts at issue before us contained the code reflecting that the prescription was suitable for generic substitution.
Jane Pettito, a pharmacist who worked in both of Heath's stores, testified that she had unknowingly filled prescriptions from brand name containers which contained generics. She later discovered this fact and complained to Mr. Heath. She testified that he informed her not to worry about it as he would take full responsibility. He conceded to her that he knew his course of action was "not right."
She further testified that Tom Heath asked her to lie to the Attorney General's Office and beseeched her not to reveal the code used to identify prescriptions susceptible to generic substitutions. She also testified that she was not specifically aware of the Medicaid billing procedures employed by the stores.
Larry Weston, who likewise worked for Mr. Heath in both pharmacies, testified that he was aware of the generic substitutions by way of Mr. Heath's instructions. He stated he had knowledge of the fact that the state was being billed for brand name drugs when generics were in fact being dispensed and said he witnessed Mr. Heath participate in this activity.
Lydia Oswalt, a pharmacist who did relief work at Medi-Shop and Heath's and who worked as a student, testified that she was told not to use a brand name drug in one instance, but was instead instructed to use drugs that came from an unmarked bottle. She was aware that the practice of substituting generics was going on at Heath's, but she was unaware of the procedure by which the state was billed. She also said she was unaware of any substitutions at Medi-Shop.
The foregoing evidence, when viewed in the light most favorable to the prosecution, shows that the defendant initiated and continuously perpetrated a scheme of dispensing generic drugs and billing the state for more expensive brand name drugs. The testimony of the defendant's employees in this regard is corroborated by the location of generic drugs in large brand name bottles on the shelf of the defendant's pharmacies and the labeling of certain prescriptions retained at the pharmacy as being susceptible to substitution with generics for prescribed brand name drugs. This evidence is thus sufficient to support the jury finding of intentional conduct and guilty knowledge on the part of defendant as to the four counts on which the defendant was convicted.
However, we determine that it will nevertheless be necessary to reverse the defendant's conviction on Count 6.
This count involved a prescription filled at the Rayville pharmacy and written for Minnie McKnight, an illiterate. Ms. McKnight testified that she filled her prescriptions at a number of pharmacies and that on many occasions she mixed the same medication obtained from different pharmacies in the same bottle for the sake of convenience.
Thus, while it seems highly likely that generic drugs were intentionally substituted in Minnie McKnight's case, we determine that under the standard of Jackson v. Virginia, supra, we are required to reverse the defendant's conviction on this count. From this record, it seems sufficiently possible that the generic drugs which were obtained from Ms. McKnight by the state investigators could have been dispensed by another pharmacy and were located in Heath's bottle as a result of her *502 practice of mixing drugs from different pharmacies. We, therefore, reverse the defendant's conviction and sentence as to Count Six.
However, we have no such problem with respect to the other three counts.
Betty Hales, the recipient involved in Count Four, testified that she obtained the medicine in question from the Medi-Shop in Mangham. The pills were located at her mother's house where they were retrieved. Both parties identified the bottle. Mrs. Hales testified that she did not combine her medication at any time. The record shows that the pill bottle in this count is the only one of the four that contained the name of the pharmacist that filled the prescription. Also, it is the only one dispensed at the Medi-Shop.
Betty Nelson, the recipient of the prescription involved in Count Eight, identified her medication as coming from Heath's Pharmacy in Rayville. She stated that she traded at both Heath's Pharmacy and Jordan's Pharmacy, but never mixed her medication.
Hazel Sanders, the daughter of Louise Bishop, the actual recipient, identified the pill bottle which belonged to her mother. Mrs. Sanders, a licensed practical nurse, testified that her mother's health precluded her mother from testifying. She stated that she and her five sisters assisted her mother. She stated that she and her sisters handled her mother's medications carefully and that medications were not mixed except when only one or two pills remained in a bottle and a prescription had been renewed. She further stated that her mother's prescriptions were predominately filled at Heath's Pharmacy.
Mrs. Bishop's oldest daughter, Roberta Bradley, was called as a defense witness. She stated she lived directly behind her mother who was confined to her home. She stated that her mother had been ill for some twenty-three years and had taken a number of medications during that time. She also stated that when she went to have a prescription refilled, she would take any medicines remaining in the pill bottle out and take the empty bottle to the drug store. On cross-examination, she insisted that the employees at Heath's Pharmacy regularly asked her if she would accept a generic substitute. At one point, she testified that her responses to these requests were affirmative. When asked if this inquiry was made of her on each occasion, she responded that if one wanted generics, "He'll ask you do you want generics and if you don't, you don't have to take them." It should be noted in this respect that although the vial obtained from Mrs. Bishop was labeled as containing the brand name drug Lasix, it actually contained a generic substitute.
When the totality of the evidence is viewed in the light most favorable to the state, we conclude that in Counts 4, 8 and 11, the state presented sufficient evidence to support the conviction. The evidence demonstrates that on each of these counts the state was billed for more expensive brand name drugs and paid for those drugs when in fact generics were placed in each of the prescriptions dispensed. There is no doubt that each of these was dispensed by the defendant's pharmacies. The abundant testimony of Heath's former employees reveals that Mr. Heath initiated and participated in the scheme of substitution in order to receive greater compensation than he was entitled. This assignment of error lacks merit with respect to Counts 4, 8 and 11. The defendant's convictions are affirmed thereon.
In summary, defendant's conviction is affirmed as to Counts 4, 8 and 11 but is reversed on Count 6.

SENTENCEASSIGNMENTS OF ERROR 9 AND 10
Assignment of Error Number 9 complains that the sentence imposed upon defendant is excessive in violation of LSA-Const. Art. 1, § 20 (1974). In Assignment of Error Number 10, the defendant complains that the trial court erred in its "Ruling on Motion to Assess Costs" by assessing prosecution costs against the defendant.

Excessive Sentence
The defendant was sentenced to four years at hard labor and a fine of *503 $2,500.00 on each count. The jail terms which were ordered to run concurrently, were suspended. He was placed on five years supervised probation on each count. One of the conditions of the probation was that he serve six months in jail.
LSA-Const. Art. 1, § 20 (1974) provides that no law shall subject any person to excessive punishment. A sentence is constitutionally excessive "if it is grossly out of proportion to the severity of the offense or nothing more than a needless and purposeless imposition of pain and suffering." State v. Griffin, 455 So.2d 681, 683 (La.App. 2d Cir.1984), writ denied 458 So.2d 128 (La.1984). LSA-C.Cr.P. Art. 894.1 also provides the criteria to consider in determining whether a sentence is excessive. State v. Griffin, supra. In order for an appellate court to review a sentence to determine its constitutionality, the trial court must state for the record the considerations taken into account in imposing the sentence and the factual basis for these considerations. State v. McGhee, 469 So.2d 1051 (La.App. 2d Cir.1985).
As stated by the trial judge, the type of crime of which the defendant was convicted threatened serious harm. The defendant was placed in a position of trust, and he violated that trust. Although in the defendant's case, the total loss to the State on the three counts of which he stands convicted is relatively insignificant, the potential for harm in this type of crime is great. It threatens to deplete the funds of the Medicaid program, thus depriving needy recipients of the drugs they need. In light of the seriousness of the crime, a suspended sentence, probation, and only six months in jail is clearly not excessive.

Prosecution Costs
The defendant argues that no costs should have been assessed against him. He argues in the alternative that if costs are assessed against him, he should be liable for only 4/13ths of the costs, which represents the ratio of his acquittals to his convictions. In accordance with LSA-C.Cr.P. Art. 887, the court assessed costs of $3,865.47, while the state asked for $4,951.92.[6]
The defendant submits no argument as to why he should be liable for only a percentage of the costs other than to state that because of his conviction on only some of the counts, the imposition of the total costs attendant to the trial is inappropriate. We disagree.
LSA-C.Cr.P. Art. 887 establishing a convicted defendant's liability "for all costs of the prosecution or proceedings" does indeed state that the defendant is not liable "for costs if acquitted or if the prosecution or proceeding is dismissed." In our view, the latter phrase is not intended to relieve a defendant of proportional costs of a multicount prosecution where he is convicted of significant offenses therein. It is apparent from the nature of this cause that the costs of prosecution of each of the thirteen counts separately would be virtually the same as it would be for prosecution of all of the counts concurrently. In other words, thirteen separate prosecutions would probably cost about thirteen times as much as this prosecution. Thus, if these counts had been severed and the defendant tried on thirteen separate occasions, his liability would have been essentially four times that assessed by the trial court in this instance. From the standpoint of total liability for costs, therefore, consolidation was of an economic service to the defendant. We are not persuaded by his argument that only proportional costs should be assessed.
Furthermore, as a general proposition, we view the application of this statute as addressing itself to the sound discretion of the trial court, which discretion should not be disturbed absent a showing of a clear *504 abuse thereof. While we do not have the details of the instant costs, the tenor of the record is that the trial court was quite fair to the defendant. In sum, we see no abuse of discretion and are not persuaded by the defendant's proportional contention.
We find no merit to Assignments of Error 9 and 10.

CONCLUSION
In conclusion, we determine that the defendant's conviction and sentence should be reversed with respect to Count Number Six and that his conviction and sentence on the other three counts should be affirmed.
CONVICTION AND SENTENCE ON COUNT NUMBER SIX REVERSED, CONVICTIONS AND SENTENCES OTHERWISE AFFIRMED.

ON APPLICATION FOR REHEARING
Before FRED W. JONES, SEXTON, NORRIS, LINDSAY and HALL, JJ.
Rehearing Denied.
NOTES
[1] It should be noted that appellant also complained in brief about, but did not assign as error, the failure of the trial court to provide copies of interview summaries prepared with respect to other state witnesses. At defendant's request, the court examined all interview summaries en camera and declined to order production of those summaries. The court did, in an abundance of caution, provide certain information from the summaries of four witnesses. We view this material as slightly more inculpatory than exculpatory. We further note that the defendant has pointed to no item of specific prejudice resulting from the failure to receive these summaries other than to assert that the prejudice with respect thereto "is best seen in the testimony of Mr. Weston wherein he testified that he did not recall making exculpatory statements recorded in his interview summary." Thus, this contention seems to be solely related to the alleged failure to receive the summary of the interview of Mr. Weston.
[2] LSA-R.S. 14:70.1 reads as follows:

§ 70.1. Medicaid fraud
The crime of medicaid fraud is the act of any person, who, with intent to defraud the state through any medical assistance program created under the federal Social Security Act and administered by the Department of Health and Human Resources:
(1) Presents for allowance or payment any false or fraudulent claim for furnishing services or merchandise; or
(2) Knowingly submits false information for the purpose of obtaining greater compensation than that to which he is legally entitled for furnishing services or merchandise; or
(3) Knowingly submits false information for the purpose of obtaining authorization for furnishing services or merchandise.
Whoever commits the crime of Medicaid Fraud shall be imprisoned, with or without hard labor, for not more than five years, or may be fined not more than ten thousand dollars, or both.
[3] The record is clear that brand name drugs in each instance are more expensive than generics.
[4] This documentation showed that each pharmacy was assigned an individual state provider number which must be reflected on each prescription dispensed on the Script 19 forms submitted for reimbursement.

Also, Health signed Provider Enrollment Forms which included the following language:
I agree to adhere to the published regulations of the Secretary and OFS Medical Assistance Program including those rules regarding recoupment and disclosure requirements as specified in 42 CFR 455, Subpart B.
Heath signed a document entitled "Provider's Election to Employ Magnetic Tape Submission of Claims for Processing in the Louisiana Medical Assistance Program," which included the following language:
The undersigned Provider shall continue to be ultimately responsible for the accuracy and truthfulness of all medical assistance claims submitted for payment.
Additionally, Heath signed a "Disclosure of Ownership and Control Interest Statement," which included the following language:
Whoever knowingly and willfully makes or causes to be made a false statement or representation on this statement may be prosecuted under applicable federal or state laws.
[5] State law provides that the name of the dispensing pharmacist shall be placed on the label of each prescription dispensed. LSA-R.S. 37:1195 B.
[6] We gather from discussions in the record that the state presented documentation to support the costs claim, but that documentation was not attached to the record. Apparently, the trial judge only allowed costs attendant to the trial itself, as opposed to those arising from the investigation of the case.